[No. 2995.   May 2, 1928.]

STATE v. GURULE.

[267 Pac. 63.]

O. O. Askren, of Santa Fe, and H. J. S. Devries, of East Las Vegas, for appellant.

Robert C. Dow, Atty. Gen., and Frank H. Patton, Asst. Atty. Gen., for the State.

OPINION OF THE COURT

BICKLEY, J.   Alejandro Gurule was convicted of second degree murder for the killing of Guadalupe Gallegos in Mora county.   Counsel for appellant states in his brief that no error was made in the taking of the testimony and none was made in the instructions as abstract propositions of law, and the only errors complained of are the failure of the court to instruct a verdict and his submission of the case on instructions of murder, and the

court's overruling the motion for a new trial, all of which involved only one question, to wit, Was there sufficient substantial evidence to support a verdict of murder in the second degree?

Appellant concedes that the verdict must stand if there is any substantial evidence to support it, and further declares that: "If all the evidence supports self-defense, there can be no substantial evidence to support the verdict."

The following are some of the undisputed facts: Alejandro Gurule was 22 years of age and married to a sister of the wife of the deceased. Guadalupe Gallegos, the deceased was about 45 years of age. The killing occurred in the town of Mora in a 4-room, L-shaped house of Bernard Higgins, the father of Mrs. Gurule and Mrs. Gallegos. Gallegos had been separated from his wife a number of times and the last occasion until 14 days before the killing. Gallegos and his wife had been married for about 24 years and had 8 children. The deceased was a drinking man and when under the influence of strong drink was quarrelsome with his wife and other members of his family, but when sober he was a good husband. He was rarely sober. His wife on several occasions had left home in order to avoid quarreling and through the apprehension of danger. Upon one occasion her son Blas had taken a knife and hammer away from his father when he was in the act of assaulting Mrs. Gallegos.

Upon the evening of the homicide, there were present in the house Mrs. Gallegos, Mary Gallegos, Blas Gallegos, some small children, and the defendant, Alejandro Gurule. The deceased came home about supper time, washed up for supper and during the meal engaged in reading a letter. He had been drinking and had a revolver in his waistband. His little boy had a wooden pistol, and the deceased told the child that his (Gallegos') gun would kill. Gallegos let one of the children have the pistol. The wife took it away from the child and afterwards Gallegos took it away from her and told her that he was the only one who had a right to that gun. After supper, while

Mary was engaged in washing the dishes, the wife went to a bedroom at one end of the house and Blas and Gurule went to a bedroom at the other end of the house. These two rooms were separated by a storeroom and a kitchen. The deceased picked up his two year old baby and went out into the corral and fired a shot with the pistol, whereupon his wife, Emma, followed him to get the baby away from him, because she was afraid that in his intoxicated condition he might harm the baby. She got the baby away from him and the deceased went back into one of the bedrooms. A little later Mary and Blas and Gurule went to the other bedroom and began to play cards. The deceased, Gallegos, sat on the bed and quarreled with his wife. During the quarrel he had a pistol and some cartridges in his hand. The deceased upbraided his wife for letting Mary stay in the other bedroom with the boys. Gurule had been staying at the house almost continuously day and night for some weeks, and he and Mary played cards together very frequently, sometimes alone and sometimes with others. The state sought to show that there were some improper relations between the defendant, Gurule, and Mary, but the record, in our opinion, does not support such insinuations. The most that appears is that the deceased was displeased at Mary's being in with the boys and censured his wife for permitting it. Gallegos told his wife to go and get Mary, which she did. Mary was scared when she was called back into the room because she was afraid her father would be angry with her. When she came in Gallegos was standing in front of the stove filling his pipe. He seemed angry and told her that if she had not gotten enough playing cards to go back and get some more. Concerning the evidence immediately preceding the killing, Mary testified, regarding Gallegos:

"He was standing in front of the stove, and he told my mother that he was carrying the gun to use on the son of a bitch that would try to protect or defend her. Then he went to the door; then he grabbed his pistol; then I believed that he had shot himself. He dropped on the door; then my mother yelled at my brother for him to go where he was lying; then Alejandro came in through the middle door and told him not to raise the body until the sheriff would arrive there. That was all."

Mrs. Gallegos, describing the events immediately preceding the killing, testified:

"Q. Then when you called Mary, where did you and Mary go, if any place? A. We went directly to the room where he was. Mary sat on a trunk. He asked her where she had been and what doing. She answered she had been playing cards in the other room with Blas and Alejandro; then he said to her, he was angry at her: 'Now, if you have not had enough go and get enough.'

"Q. Then what did he say to you, if anything? Listen, please, for one time tell what he said. This is the last time you will have to say it, and use the expressions and terms he used, so that this jury can tell just what happened. A. Then he got up, and he was angry, and he said to us that we were vagerbonds, and that that gun that he had there he had to use it on the son of a bitch that would defend me.

"Q. Now then, where were you at the time he made such a statement as that? A. I was standing close to the stove. I was on the one side and he was in front.

"Q. Before he left that room did he make any statement to you with reference to the gun or cartridges? A. Before he said these words to me, he was sitting on the bed, and he was doing something with the gun; I don't know what he was doing; he took some cartridges out of his pocket.

"Q. Go ahead; tell as near as you can what happened; what was done before you heard a shot? A. Those words that he said before then; he lit his pipe and walked towards the door. I stooped over and tied my shoe so that I didn't see him then, and then I heard a shot, and I could not say any more from then on.

"Q. You didn't know whether he had shot himself or somebody else? A. No; I did not."

Blas Gallegos, son of the deceased, testified on behalf of the state that after Mary left the card game Gurule told him to go and see if his father was scolding Mary; that he went to find out, and came back and told Gurule that his father was not scolding her; that Gurule killed his father by shooting him with a rifle which had theretofore been in the room occupied by the witness and Gurule. The witness testified on cross-examination that in addition to going at the request of Gurule to see whether his father was scolding Mary, he also wanted to see if his mother was all right, and whether he was quarreling with her.

There was a light in the room where deceased and the women were, but no light in the next adjoining room, the kitchen, but some light was shed through the connecting door into the kitchen. The defendant testified in his own behalf and reference will be made only to such portions of his testimony as are different from the foregoing recitals. Defendant said that he and the deceased had never quarreled and that he had no ill feeling toward deceased, although he also stated that when defendant came home from the store and greeted the deceased "he spoke to me in a very reluctant manner." After reciting some circumstances not very important, the defendant testified:

"After a while I heard they were making considerable noise in the room where Emma and Guadalupe Gallegos were, and I told Blas to go and see what was going on; then Blas said to me they were arguing quite a bit; then I went in and Blas saw me when I was about to reach the dark room; then I heard Guadalupe Gallegos say that he had that gun to use it on her, or any son of a bitch that would stick up for her."

He said:

That he had no rifle in his hands at that time, but went back and grabbed one and came back into the kitchen and was going where they were to stop them from fighting, and "when I grabbed the gun I came in this direction and I saw him (deceased) coming in from this bedroom, and before coming into the door I saw him that he put his hand in his belt and draw out the pistol, and at the time he was going to fire a shot at me, and I grabbed the gun, and I don't remember how I pulled the trigger; at any rate, the shot was fired and I heard it."

Defendant said that he had made a statement shortly after the killing denying having shot the deceased and explained that he was afraid the relatives of the deceased would not tell the truth about it to Mr. Armijo and the sheriff, Milnor Rudolph. The defendant testified that after he shot the deceased fell to the floor, and he said: "Oh, you son of a bitch!" The defendant denied that he asked Blas to go and see whether or not his father was scolding Mary. He denied that he had told Milnor Rudolph, the deputy sheriff, that he had asked Blas to go and see if Mary was being scolded, and he denied making a statement in the presence of Jose Flores to the same effect; he said that he started to the room where the deceased and his wife and Mary were for the purpose of

pacifying them, and he took the Winchester rifle along because he heard the deceased say that he had the pistol for the purpose of killing her or any one that would go to defend her, and that he thought that that statement was intended for him. Defendant said he was standing in the center of the kitchen. Defendant admitted that he testified at the coroner's inquest in substance that Mary and Blas were playing cards and that he heard a report and that when he came into the kitchen Guadalupe Gallegos was there dead. Further admissions appear in the following testimony:

"Q. Is it not a fact that you told Rudolph, Mr. Milnor Rudolph, that, in substance and effect, that you had killed Guadalupe Gallegos, that you wanted to deliver yourself to the authorities, but that the women would not let you? A. Yes; I did, but it was a lie.

"Q. You lied to Milnor Rudolph when you told him that A. Yes, sir.

"Q. Just as you lied when you testified before the coroner's jury as Lupe having killed himself? A. Yes, sir."

Witness testified that his wife had told him two years prior to the killing that Lupe Gallegos had assaulted her sister with a knife and hammer, but that he did not conclude from that that Lupe was a dangerous man.

Milnor Rudolph, deputy sheriff of Mora county, testified that defendant told him that defendant, Blas Gallegos, Jr., and Mary Gallegos were in the farther room of the house, and that while they were there some one called Mary to the kitchen; then defendant told Blas to go and see if Guadalupe Gallegos was scolding Mary, and Blas came back and told him that Guadalupe was talking to her, and defendant got up and went to where he could see Guadalupe and 'saw him sitting on the bed with a pistol in his hands, and then defendant came back to where the Winchester was and put it against the wall near the door, and after that he stood and watched Guadalupe sitting over there on the bed; that directly Guadalupe moved from the bed to another place in the room where defendant could not see him; defendant then picked up the Winchester and came over to about the middle of the kitchen; defendant could see Guadalupe standing by the

stove, and he was "talking something there," and Guadalupe stuck a pistol in his waistband and he started to walk towards the door leading into the kitchen, "and when he got to the door he kind of stopped and he made a move for the gun, and, using Alejandro's words, he said he leveled down on him and plugged him through."

Jose Flores, called by the state, described defendant's statement, made in his presence, as follows:

"Alejandro said that Blas—that he and Mary and Blas—were all three of them playing cards in one of the rooms when Lupe arrived from town; then he asked where Mary was; then Alejandro sent Blas to see if Lupe was ill treating her, beating Mary up. Blas returned and told Alejandro that he was; then Alejandro grabbed the gun and went to the kitchen; then Lupe was on his way from a room to the kitchen and was carrying a gun, a pistol; then Lupe stopped. Alejandro grabbed his rifle and fired a shot into Lupe. That is all I know."

On cross-examination, witness said that defendant stated that Guadalupe grabbed his gun just as he got to the door.

The court instructed the jury that the defendant admitted firing the shot that killed the deceased but that he pleaded not guilty on the ground that he did so in self-defense. The court then instructed the jury on the law of self-defense. One of these instructions was as follows: .

"I instruct you that a correct theory of self-defense is that the party assailed, being without fault himself, and in a place where he had a right to be, has the right to repel force by force, and he need not believe that his safety requires him to kill his assailant in order to give him the right to make use of force for that purpose when his life is in imminent danger, or he is in imminent danger of great bodily harm, or where, from the acts of his assailant, he believes, and has reasonable grounds to believe that he is in danger of losing his life or receiving great bodily harm from his assailant. The right to defend himself from such danger or apprehended danger, may be exercised by him, and he may exercise it to any extent which is reasonably necessary. He need not believe that he can only defend himself by taking the life of his assailant, and if the death of his assailant results from a reasonable defense of himself, he is excusable, whether he intended that consequence or not, or whether he believed such result was necessary or not. A person assailed, being without fault himself, and in a place where he has a right to be, need not retreat in order to avail himself of the plea of self-defense, but may stand his ground and repel force by force to any extent which

is reasonably necessary to defend his life or defend himself from great bodily harm."

The jury were given the usual instructions relative to the credibility of the witnesses, and were told that they were not bound to believe anything to be a fact merely because a witness had sworn it to be so, if they were led to believe from other credible testimony in the case that such witness is mistaken or has willfully testified to that which he knows to be false.

So, then, the jury were confronted with the duty of determining, among other things, whether the evidence produced established self-defense. They had a right, and it was their duty, to consider whether from all the facts of the case the defendant was without fault and in a place where he had a right to be; the respective age and physical condition of the parties to the encounter; the degree of intoxication of the deceased at the time of the shooting; the fact of defendant arming himself with the means by which the killing was perpetrated; whether the circumstance of his being so armed was satisfactorily explained; whether the defendant had reasonable ground to believe that he was in danger of losing his life or receiving great bodily harm from the deceased; the denials of defendant shortly after having shot the deceased, and other conflicting statements. It was their duty to weigh all the evidence in determining whether the elements of the degrees of the offense charged existed or whether circumstances of justification, excuse, or mitigation had been shown.

The same contention made by appellant here was made before the trial court in a motion for a new trial and by the court denied.

We have examined the record diligently and have carefully considered the arguments presented by the able counsel for appellant, and yet we are unable to discover that there is not sufficient evidence to support the verdict.

Finding no error in the record, the judgment of the trial court is affirmed.

There being language in our former opinion not now satisfactory to us, said opinion is withdrawn; and it is so ordered.

PARKER, C. J., and WATSON, J., concur.